## Will Bell v. The State.

### No. 2895.  Decided May 10, 1905.

**1.—Manslaughter—Evidence—Form of Question.**

Where a question appeared to call for the conclusion or opinion of the witness, there was no error in excluding it, although part of the question was legitimate.

**2.—Same—Charge of Court—Harmless Error—Provocation.**

Where the evidence showed in a prosecution for murder that deceased had insulted defendant's fiancée, but that defendant had repeatedly met deceased thereafter without resenting the insult, a charge on this phase of the case, while erroneous, was harmless, because the court in effect withdrew it from the consideration of the jury and submitted the provocation at the time of the homicide, in his charge on manslaughter.

**3.—Same—Fact Case—Self-Defense—Manslaughter.**

See record where the evidence presented a nice question for the determination of the jury, whether defendant acted in self-defense, or under circumstances calculated to produce in his mind terror or alarm, superinduced by the attitude of deceased as it appeared to him at the time, rendering the mind of defendant incapable of cool reflection.

Appeal from the District Court of Williamson. Tried below before Hon. V. L. Brooks.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The principal facts in evidence were as follows: Verly Johnson, witness for the State, testified as follows: On Christmas Eve night I was at Mat Griffin's place, Mat Griffin runs a little store at this place, this store is in Oklahoma Addition in the town of Taylor, Williamson County, Texas, the store is in a row with three other buildings, all of which face west, in front of these three buildings is a gallery extending along the width of all three, the gallery extending out from the front of the buildings ten or twelve feet, Mat Griffin's place is the first building to the north in this row of buildings, adjoining it on the south is a building that is occupied by a restaurant, and adjoining the restaurant on the south is a building used as a beer saloon, just south of the beer saloon is an alley some six or eight feet wide, running east and west along the side of the beer saloon building. Mat Griffin was giving a supper and dance at his store that night and there was a large crowd at that place on that night, attending the supper and dance, about seventy-five or a hundred people, it was like an ordinary negro dance and supper. I went to Mat Griffin's place about 10 o'clock that night.

The defendant, Will Bell, was there and the deceased, Horace Odom, was there. The deceased was drinking, I did not see the deceased and the woman, Avery Griffin, have an altercation. I saw the defendant and the deceased and heard the squabbling, they were just "a-mouthing around." I saw Mat Griffin come and put Horace Odom out of the house, this was soon after I got there, some thirty or forty minutes after that, Horace Odom was back in the house, and I saw him and the defendant squabbling again, and I saw them again put Horace Odom out of the house. I did not hear what the defendant or the deceased either said on either of these occasions. After this, and probably about twelve o'clock on that night, I was standing out on the gallery, and just in front of the front door of Mat Griffin's place, at this time the deceased, Horace Odom, Lon Campbell, Sam Smith, and several other negroes were standing out on the gallery between the front door of Mat Griffin's place and the edge of the gallery. The defendant, Will Bell, came out of the door and started down the gallery, going south, after going a few steps he called me and said "Verly, come here." I overtook him and we walked on to the alley together. When I overtook him he begun talking to me, he asked me if I was going home with Emma Griffin. We went past the beer saloon, and turned into the alley, and after going about six feet down the alley from the west corner of the house, we stopped and were making water. While we were thus engaged the deceased, and three or four other negroes came off the end of the gallery and stopped on the plank walk running across the alley and in about five or six feet from us. The deceased turned, facing the defendant and said something to the defendant about "fight" to which the defendant answered, "Horace Odom, I told you"—I do not exactly remember the rest. At this time the deceased was in about two steps of the defendant, and the deceased had something in his hand, in his right hand, and had his hand raised up from the side of his body

and drawn back like this (hereupon the witness illustrated as though he had something in his hand, and throwing his palm upward and close out from his side and a little back). I could not see what was in his hand as the fingers was closed over it. Whereupon the defendant drew his pistol from somewhere, I do not know where, and the deceased turned as to run throwing his right hip and side towards the defendant and the defendant fired, when the shot was fired everybody run, and the defendant run and I run. I ran west, nearly across the street, then I turned and came back, when I came back Horace was crawling on the gallery, and was nearly in front of the beer saloon, when he got about in front of the beer saloon, he laid down and staid there until they came and got him and carried him away.

Squire Harris testified for the defendant as follows: "I was at Mat Griffin's house on the night of December 24, 1904, about nine o'clock in the evening I was sitting at a table, eating fish, and Miss Avery Griffin was waiting on the table. Horace Odom was eating at the same table, she asked him when he was through to pay for what he was eating, and he refused, and said, "What in the Hell are you raising a row about, you are no better than any other God-damn Mud hen, I've had you myself." Willie was standing there and took it up, Horace got up with his knife open, and Willie Bell picked up a soda water bottle, and they mouthed around there awhile, and old Mat Griffin came up and put Horace out."

On cross: "Both of them seemed to me that they had been drinking some, I did not see either one of them take a drink."

Mat Griffin, being sworn for the defendant, testified as follows: "I am the proprietor of the place at which the dance and supper was held on last Christmas Eve night in Taylor. My daughter, Avery, came to me early in the evening and said that Horace Odom had eaten chili and drank soda water and refused to pay for it, but had paid her one cent only, and that when she asked him to pay for what he had eaten, he abused her and told her that she was no better than any other damn mud hen, and that he had had her himself, she said that he claimed to have had improper relations with her, she was crying at this time. I went over to where Horace Odom was and found him facing Willie Bell, he had an open knife in his hand, and Willie Bell had a soda water bottle in his hand. I took hold of Horace Odom and made him get out of the house. About an hour after this Horace wanted to come into the house, and I told him that if he would behave himself and act as a gentleman he might come in. He said that he would, and I let him come in. A short while after he had come in, some one told me that Horace was raising a disturbance again and I went to where he was and he had Willie Bell backed up in a corner, and Horace had a knife open in one hand and a rock in the other, and I took hold of Horace and made him get out of the house again.

Horace was drunk, Willie Bell was not drinking. About a half hour after this, I was standing in the front door, Horace Odom, Lon Campbell,

and Sam Smith, and some others were standing on the gallery in front of the door. Willie Bell came out of the house, by me, and started down the gallery, as he started down the gallery he called Verly Johnson; then after they had gone down near the alley, Horace Odom said to Sam Smith, "There goes the son-of-a-bitch, I'll get him now," and thereupon, Horace Odom, Lon Campbell, Sam Smith, and several others started down in the direction Willie Bell had gone. I followed them, and as I got down opposite the door of the beer saloon, I saw Horace Odom turn and face Willie Bell. I was at this time near the west edge of the gallery, and about thirty feet from the defendant and Horace Odom. I saw Horace draw back his arm, and then Willie Bell pulled his pistol and Horace careened his body, his right side towards Willie Bell, and Willie Bell shot. I was not close enough to hear what was said by the parties, but the shooting occurred in a few seconds after Horace Odom had reached the alley, and turned facing Willie Bell. Willie Bell then stepped back and shot."

There was testimony that defendant and Avery Griffin were engaged to be married at the time the deceased insulted her.

*Nunn & Ward,* for appellant.—The court erred in submitting the issue of manslaughter to the jury, for the reason that the evidence shows that the killing was not the result of sudden passion arising from an adequate cause based upon provocation arising at the time of the commission of the offense; which portion of said charge was properly excepted to in the defendant's motion for a new trial. Articles 715 and 716, Code Criminal Procedure. Attaway v. State, 55 S. W. Rep., 45; McLaughlin v. State, 10 Texas Crim. App., 340; Rutherford v. State, 16 Texas Crim. App., 649; Johnson v. State, 43 Texas, 612; Hopkins v. State, 50 S. W. Rep., 382; Orman v. State, 24 Texas Crim. App., 495; Foster v. State, 8 Texas Crim. App., 248; Bracken v. State, 29 id., 362; Arthur v. State, 80 S. W. Rep., 1017; Stewart v. State, 15 Texas Crim. App., 598.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at confinement in the penitentiary for a term of four years, hence this appeal.

Appellant excepted to the action of the court refusing to permit appellant on cross-examination to propound to witness Verly Johnson, the following question: "What was the deceased in the act of doing at the time and just prior to the time defendant shot him? What was the impression made upon your mind by the action of the deceased at said time? From your position, what did it seem to you deceased was making an effort to do?" This was objected to by the State, on the ground of its immateriality and that it called for the conclusion of the witness, and not for facts, and that the question was leading.

Of course, appellant was authorized to ask a leading question on cross-examination of the witness. It occurs to us that some of the matters inquired about were material. However, the question, if it be conceded one interrogatory, appears to call for the conclusion or opinion of the witness, and as put, we believe the court was justified in excluding it. If appellant desired to ask that portion of the question which was legitimate to wit: "What was deceased in the act of doing at the time, and just prior to the time defendant shot him?" he should have propounded the question in that form, without confusing it, for as put it involves the opinion of the witness. He did not do this, but demanded an answer to the entire question as propounded. Besides, it is not disclosed what the answer of the witness would have been: save that appellant in the bill shows that while he did not know what the answer of said witness would have been to said questions, yet he expected to elicit from the witness in answer to the question the statement that deceased immediately before the shooting by defendant, was walking upon defendant and in the act of striking defendant with something in his hand. It may be conceded that this was all that could be expected of appellant under the circumstances in the cross-examination of a State's witness. But this expectation was confined to only a portion of said question. As stated, before, if counsel had eliminated the objectionable portion of said questions and had asked the witness only that part of the interrogatory which was legitimate, then the action of the court would have appeared improper. But as before stated, the question was put to witness in its entirety, and it was the duty of the appellant on objection being sustained to eliminate the objectionable portion of said interrogatory. Besides, if we were permitted to recur to the statement of facts, it will be seen that this witness as well as others, answered that portion of the question, as to what deceased was doing before and at the very time he was shot.

Appellant objected to the charge of the court on manslaughter: his insistence being that there were no facts in the case that authorized a charge on manslaughter. But conceding that there was—the only adequate cause was an insult to the fiancee of appellant; and that the court, after presenting this, in effect withdrew it from the consideration of the jury. We do not believe that the evidence adduced on the trial presented the issue of manslaughter predicated on an insult to the fiancee of appellant, because the uncontroverted proof showed that while she might have been considered at the time under the protection of appellant, yet the insult was offered in appellant's presence, and he did not resent it then. The proof further shows that he met him repeatedly afterwards; in fact appellant's exception to the charge grants this. It may be conceded that the charge as given on this subject was erroneous, as it was a mere abstract charge, and there was no application of the law on this subject to the facts of the case; yet, inasmuch as no charge was called for on this subject, we fail to see how it operated to appellant's injury, especially as the court gave a charge on manslaughter on

the very phase of the case presented by the evidence. And in addition, authorized the jury to look to all the antecedent facts and circumstances existing between the parties that might intensify the provocation at the time. As we view the record, the phase of manslaughter which arose from the evidence was the conduct of deceased at the very time of the homicide. He had previously insulted Avery Griffin, to whom appellant was engaged, in appellant's presence, and they had had an altercation on that subject. Deceased had followed this up by subsequent hostile conduct towards appellant. Some time after this, when appellant retired from the house and went with a companion to an alley nearby, he passed deceased and some companions on the way. Deceased followed him into the alley, and there in the dark, some of the witnesses say he was in the attitude of making an attack on appellant, advancing towards appellant, using hostile expressions, and having in his hand something, the character of which the witnesses were unable to state. Now the hostile attitude of deceased at this juncture, which just preceded the shooting, may not have justified appellant in slaying the deceased, in the opinion of the jury; yet under the circumstances it was certainly calculated to create in his mind, emotions of alarm or apprehension of danger. On this attitude of the case, the court presented the charge on manslaughter, and authorized the jury in judging of the provocation at the time, to look to all the antecedent acts and conduct between the parties preceding this. This was the phase of the case which, in our judgment, was presented by the evidence.

The improper charge on insults, which the court gave, could not injuriously affect appellant. Indeed this charge served to call attention to the antecedent insult in order to enhance the provocation given at the time. Moreover, the jury found appellant guilty of manslaughter, and they did so evidently on the theory of the case as presented by the court.

Appellant insists that the verdict of the jury is not sustained by the evidence. We have examined the record carefully in this regard, and on this subject we would observe that the evidence presented a nice question for the determination of the jury; that is, whether appellant acted in his self-defense from an attack being made or about to be made on him by deceased at the time, or whether he acted, not in self-defense, but under circumstances calculated to produce in his mind terror or alarm superinduced by the attitude of deceased as it appeared to him at the time. The jury decided that appellant did not act in his necessary self-defense, but shot deceased under circumstances which alarmed him and rendered him incapable of cool reflection. We believe the evidence on this subject is sufficient to justify the verdict, and we do not feel authorized to disturb it.

The judgment is affirmed.

*Affirmed.*

Davidson, Presiding Judge, dissents.

[Motion for rehearing overruled without written opinion.—Reporter.]